# DISTRICT OF COLUMBIA *v.* PIERCE.

MUNICIPAL CORPORATIONS; DIRECTION OF VERDICT; STREETS AND SIDE-
WALKS; SEWER TRAPS; INSTRUCTIONS TO JURY; EVIDENCE.

1. The trial court properly refuses to direct a verdict for the defendant in
   an action against a municipality to recover damages for injuries
   sustained by the plaintiff by reason of falling into a manhole in the
   sidewalk, where there is evidence tending to show that the cover
   of the manhole was warped, and did not fit, and was easily dis-
   placed when trod upon, and that this condition had been in existence
   for a considerable period of time before the plaintiff was injured,
   so that the jury might have found that a reasonably careful inspec-
   tion by the defendant would have disclosed it. (Mr. Justice Robb
   dissenting.)

2. The refusal of special instructions to the jury is not error where the
   trial court covers in its charge to the jury such principles of law
   as are contained in the instructions asked.

3. In an action against a municipality for injuries sustained by the plain-
   tiff by falling into a manhole in the sidewalk, the cover of which it
   is claimed was defective, it is error for the trial court to refuse an
   instruction asked by the defendant to the effect that if the accident
   of the plaintiff was caused by the faulty design or plan of the sewer
   trap or manhole, their verdict should be for the defendant.

4. A municipality is not an insurer of the absolute safety of the covers
   of manholes or sewer traps in its sidewalks, nor is it bound to
   supply the best, safest, and newest of such covers for the purpose
   of securing the safety of pedestrians, but its obligation is to use all
   reasonable care in looking out for the safety of pedestrians by pro-
   viding appliances reasonably safe and suitable for their use (fol-
   lowing *Washington Asphalt Block & Tile Co.* v. *Mackey,* 15 App. D.
   C. 410) ; so that, in an action against a municipality for injuries
   received by a pedestrian who fell in such a manhole and who claimed
   that the cover was defective, it is error for the trial court to admit
   testimony offered by the plaintiff to the effect that a different and
   heavier sewer cover was in use generally by the municipality.

Note.—On municipal liability for defects and obstructions in sidewalks
and crossings, see note in 20 L.R.A. (N.S.) 1158.

5. In an action against a municipality for injuries sustained by the plaintiff by falling into a manhole in the sidewalk, the cover of which it is claimed was defective, it is not error for the trial court to admit testimony offered by the plaintiff tending to show that the cover in question could be displaced with slight effort by lifting or pulling it, or by both lifting and pulling it.

No. 2790.   Submitted October 7, 1915.   Decided November 15, 1915.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action to recover damages for alleged personal injuries.

*Reversed.*

The COURT in the opinion stated the facts as follows:

Sarah E. Pierce brought her action against the District of Columbia for damages caused by falling in a manhole in the sidewalk in K street, Northwest, city of Washington, and recovered a judgment for $1,500, from which this appeal is taken.

Plaintiff's testimony tended to show that plaintiff on July 12, 1912, was walking on the sidewalk in K street between Wisconsin avenue and Thirty-second street, Northwest, and stepped on a sewer top or cover over a manhole, which tipped under her weight and threw her on the sidewalk, causing injuries.

F. R. Weller, a civil engineer, who had formerly been in the District of Columbia engineer service, was called as a witness, and testified that there are several types of manhole, all of them embodying practically the same principle, that is, that there is a movable cast-iron cover, which is usually quite heavy in order to prevent its being lifted maliciously from its place; the cover generally rests on a flange of the manhole frame, and in the cover there are usually some small openings for the purpose of ventilating the sewer, and these openings also serve as a means of lifting the cover off by means of hooks or other instruments. To maintain it in place the cast-iron frame of the manhole has a projecting flange or a lip, and the cover of

the manhole itself rests upon that flange. The lower portion of the manhole cover generally—the modern manhole cover—has a deep web, about 4 inches, in order to give it additional stiffness, and also to give additional weight to the cover itself, thereby making it more rigid and securing it better in place. By "web" is meant a circular ring projecting under the under surface of the cover itself. At request of counsel for plaintiff, witness drew on blackboard a sketch of a manhole, and testified that frame is made of cast iron. Attorney for the defendant objected to any testimony as to any manhole in present use, whereupon counsel for plaintiff stated, "I am asking him about general construction of manholes and covers." The Court: "Do you intend to show that they were not using the proper kind of construction?" Counsel for plaintiff replied, "That is it, that this was not a proper kind of manhole; that it was improperly constructed and improper in every respect." Witness proceeded to state that he had examined the manhole and the cover approximately in front of 3221 K street, Northwest, on Wednesday of last week. Upon further examination witness testified that at the place of the accident he found a manhole of the type that is not used at the present time in the District, and was not used at the time he was connected with the engineer department; that it was an old type of manhole, without any stiffening web as described here, merely a thin cast-iron plate about half an inch in thickness, corrugated slightly on the top; but it is evident that it had been worn down quite smooth owing to the passage of pedestrians, indicating that at one time the corrugation of the surface was considerably greater than at present; that there were two holes in the manhole cover for the purpose of lifting the cover off the frame; that the cover rested on the circular frame,—the manhole frame, as it is called,— and that had a projecting lip on the inner surface in order to give a seat for the manhole cover to rest upon, and the function of that projection or lip is to prevent the manhole cover dropping into the manhole when it is put in place; that the lip was about $\frac{5}{8}$ or $\frac{3}{4}$ of an inch projection beyond the manhole itself, but the manhole cover did not fit exactly the frame. In other words,

there was a slight play from side to side of the manhole cover. The cover had not been embedded tightly in the frame, as some manhole covers are, due to the earth and dirt packing around it; the frame was not exactly concentric with the cover. That he judged the diameter of manhole cover was about 22 inches; that he took his two index fingers and lifted the cover from the frame, and found it lighter than the ordinary manhole cover now used; that he had made experiments with respect to displacing cover on Wednesday; that he made experiments to see how easily the manhole cover could be displaced from its position in the frame; that he took the heel of his shoe and struck the manhole cover on the edge several times, and the cover flew up out of its place, so that it went down in the manhole and oscillated back and forth. Witness was requested by counsel for the plaintiff to make a sectional drawing of the manhole, and did so, making first the cover and stating that it was just a flat plate with two holes in it and on the upper side somewhat roughened or corrugated, and the corrugations had been worn smooth. He then drew the lip, exaggerating a little in order to bring it out, and the brick wall of the manhole. He further testified that it was, roughly speaking, the appearance of the manhole cover and frame here, and with a slight projection to catch the edge of the cover as it sits in place. "I took the heel of my shoe and struck the manhole cover here, and this edge flew up so that the manhole cover swung down into a position like this. Of course it could not go all the way down in the manhole because the lip is smaller than the diameter of the cover. Therefore, it swung back and forth;" that he put his fingers in the holes, and that the cover could be very easily lifted up; that was the only experiment he made apart from trying it first to see how securely the cover was in the frame; witness was then asked to testify as to the present manhole construction in the District of Columbia, to which counsel for the defendant objected, the court reserving its ruling. Witness then stated that the essential difference between the manhole cover in question and the one in present use is its weight, the old manhole cover being about one third the weight of that in

present use, the difference in weight being due to the fact that the present type has webs that run diagonally across the manhole cover, and the cover itself is also thicker, being about three quarters of an inch to an inch thick, which is from a quarter to a half inch thicker than the old cover. In the type described as being in general use the witness stated that the only effect that these projections that go down from under the surface have on the displacement is that the additional weight makes the cover much heavier, and therefore harder to displace. Witness was then asked the difference in the vertical heights to which these two types of cover would have to be lifted before they could be displaced, to which question counsel for the defendant objected, which objection was overruled. Witness then testified the cover in question would have to be lifted only the height of the flange, probably three quarters of an inch, before it could slide off and tilt; that the cover which is now in use has a projecting ring to the under surface of the cover, and it would be necessary to lift the cover up until this ring cleared the top of the frame before it could tilt, the web being about $2\frac{1}{2}$ or 3 inches in depth, therefore the difference in height would be $2\frac{1}{2}$ to 3 inches in one case, and about three quarters of an inch in the other. Witness further testified that in examining manhole he noted that it was not exactly level, the cover and frame being slightly inclined towards the curb; the manhole cover itself was not entirely true; the cover was slightly warped with respect to the frame; they did not lie in the same horizontal plane, which would tend towards a slight rocking of the cover in the frame. Counsel for defendant stated that he had not objected to this testimony, assuming that his objections would lie to all those questions, and that it was covered by the court's ruling that counsel for the plaintiff would have to show that the manhole was in the same condition as at the time of the accident. The court answered, "Yes." Counsel for the defendant then stated that what he had in mind was his objection to the statement in regard to sewer traps at the present time. To this the court answered, "Yes."

Upon cross-examination witness testified that he had been

in the profession for sixteen years; that his line of work has been principally municipal engineering work, such as water-works and sewers; that since he left the employ of the District he has not had any experience in the District of Columbia in the construction of sewers; that his employment under the District government was supervisory of the construction of sewers and, at times, engineering; the play in the ring of the manhole cover in question was about between $\frac{5}{8}$ and $\frac{3}{4}$ of an inch, meaning the lateral motion, which varied at different points, depending upon which position you worked it in; that the play was not sufficient at any time to come within the ring opposite the place where the greatest play was visible; that it was just about equal in the greatest position to the width of the flange, but not greater; that he kicked the cover down and it flew out; that he was standing up and kicked it as one stamps on the ground; that he tried it in several positions and found that whenever the cover was at one side of the frame it would fly out irrespective of the direction in which it was kicked, if pushed over on one side of the frame it would fly out, on a line going down straight, as readily as it would in the direction looking toward the curb; that he used a little more force than he would in putting his foot on the ground; that is, he practically stamped on the cover. Witness further testified that he tried to see if the cover would fly out, and in order to do so, he first moved it over in its frame and took advantage of its greatest play; that he first determined whether there was any play in the cover, and, finding that there was, wished to determine whether it was possible to raise the cover by means of kicking it with the foot, which he did, stamping on it near the edge and near the edge of the cover; that he would consider that the test was not a severe one at all; that it is difficult to say whether it is the normal test to which a cover is subjected when a person passes over it walking down the street, because it is impossible to state what is normal in the cover; that if a little piece of gravel or a little twig should get under one edge of the cover there might be conditions under which it would take very little pressure to raise the cover; that the covers are

sometimes wedged in so that it would be impossible to raise them at all unless considerable force were used; that he did not test the cover by simply stepping on it and walking over it; that the only tests he made were to see how easily it would raise up, and the other test was to see if it would be possible to make the cover flare up by kicking it; that he stood on the cover and rocked it to see if it had any play, but he did not test it by walking over it like the ordinary pedestrian would; that the cover was not on a true horizontal plane to the frame, and it would depend on the true position of the frame whether it was warped up or down; there was an irregularity in the plane of the cover, it not being absolutely true; that the greatest extent of the irregularity was not over three eighths of an inch, between the rim and the frame; that when the cover was pushed up against the frame it projected about $\frac{3}{8}$ of an inch over the top of the frame; that the cover and the ring were not level, and that the tilt was very little judging from the eye, it was not over three quarters of an inch, or possibly an inch, which is nothing unusual, nor abnormal, if the frame and cover were absolutely true; that in testing the sewer top he first took it up with his fingers away from the ring, then put it back and tried to kick it out; that he did not try to kick it out before removing it; that the flange was practically clean when he first lifted the top out, which, as a rule, is unusual; that it is the usual thing to find dust collecting in these places; that if dirt were packed in between the frame and cover it would be more difficult to raise the cover, and with regard to tilting it by kicking it the effect would be the same; that the dirt would act somewhat in the nature of a key to keep the cover in place; it would be a packing; that he never saw a cover like the one in question during his experience in the sewer department; he had seen old types, but this one was the first of light weight he had seen, and he had looked along the street and found one, on the corner, of the new type described by him, very much heavier.

Other testimony tended to show the character of plaintiff's injuries.

Orin A. Herbert testified that he visited the place of accident,

and he stepped on the lid, and it came out, so he took it up,—lifted it. He testified that he found it light in weight, with a great deal of play in the plate, and that the flange seemed to be narrow; that he would say it was about 40 pounds in weight; that in examining it he pulled it very lightly by putting a finger in the hole and stamping it out; that since that time he has examined it several times; that there has been no change since the first time he saw it; that the manhole cover was warped, dished up; that he walked over the manhole cover several times, and got one foot on each side, and tried to rock it, and found it rocked about a quarter of an inch; that he walked down the street and stepped on the cover, and it tilted with him when the bent side was toward him; that it tilted whether pulled or not; that he could stamp it out of place.

Another witness testified that she lived in the house immediately adjacent to the cover; that she was sweeping the sidewalk about six months before plaintiff fell, and stepped on the cover, and it tilted with her, but she did not notice if it was in place; that she did not notice its condition when sweeping; that she did not report its tilting to anyone but her sister; that before or after that time she paid no attention to the cover; that it did not appear different from other sewer tops, and there was nothing to attract her attention to it.

Other witnesses testified that they had not heard of anyone having trouble with the sewer top, and had noticed nothing unusual in its appearance.

Another witness testified that he examined the sewer top at request of counsel for plaintiff, finding it 22 inches in diameter, weighing 40 pounds, and with a slight rock of perhaps $\frac{1}{8}$ of an inch; that the frame was shallow, not deep enough but what he could slip the cover over, and when gotten over far enough it balanced on the hole and tilted.

On cross-examination he testified that the weight and diameter was all he tested; that it rocked slightly, about $\frac{1}{8}$ of an inch; that he put his finger in the hole in top and slid it across, practically pushed it right off, with very little lift to it; that there was one hole in the top; that he walked over the sewer

top both times when he was there, and it did not tilt out of position; that the flange was about a half inch on the inside, and that it would not require over 10 pounds pull to move it out; that the cover would have to be moved half an inch before it would tilt.

Plaintiff testified that when walking on the street, when she put her foot on the manhole cover she heard a rattle, and went in the manhole up to her knees.

Wm. R. Johnston, for the defendant, testified that he was an assistant in the engineer department of the District of Columbia; that he made a plat of the sewer top and the place and inspected the surroundings; that he examined the sewer top, and walked over it to see whether it was loose, and discovered that it was not, and then walked over it and jumped on it to satisfy himself that he had the right place; that he did not and could not displace it by these experiments; witness further stated he did not know the weight of the cover, did not measure the play between the cover and its rim, did not know how far the cover would have to be moved to clear the rim, nor did not know how far over cover would have to be moved before it would tilt, nor did he know the exact width of the flange or rim on which the cover rested.

Another witness for the defendant testified that he examined and took the cover up just before the trial; that he walked over it, and it had no evidence of moving or tilting in any way; that he had walked over the cover and tried it after its removal, and while it was in the roadway in front of the courthouse, previous to bringing it into the court room, and its examination by the jury.

On cross-examination he stated that he was an inspector of sewers in the District of Columbia, and that on Sunday, June 28, 1914, he made his first examination of this sewer top; that he put one foot on either side of the top and tried to tilt it, but could not move it in any way. He was then asked whether there is any difference between this top and the one now in general use. Counsel for the defendant objected to the admission of the evidence; the court said: "We have already evi-

dence of that in the case, and here is a drawing of it to show and demonstrate the difference. I do not know whether it is in there under objection, but my impression is that it is." Counsel for both parties said they thought it was objected to. The court: "I see no reason why you may not show that the manhole and cover now in use are different, and how they are different." An exception was taken to this ruling.

Witness stated that he was familiar with the manhole cover now in use in the District of Columbia, and that it was a cover of a later type, and that it had a deeper flange and set down in the frame a little deeper.

Whereupon counsel for defendant asked the court if it was understood that the objection and exception above noted would lie to all this testimony; to which the court replied in the affirmative. Whereupon the witness further testified, in response to questions of plaintiff's counsel, that by reason of the later type covers extending deeper in the rims, and by reason of their greater weight, these later type covers were more stable and more difficult to displace; that the later type cover weighed approximately 90 pounds, and that the cover over the manhole at the time of the accident weighed about 40 pounds.

On redirect examination he testified that it was his duty to follow up complaints regarding sewers or the appurtenances thereof, and that in so doing he had found several hundred manhole frames and covers of the same type as the one in question, and that they were located in the different parts of the city; that he does not carry their location in his head, and cannot state where any of them are.

Another testified he was employed by the District, and removed the manhole cover and its rim from in front of premises No. 3221 K street, Northwest; that he had been instructed on Saturday to go over there Monday morning, and remove it, and that he located it by reason of the fact that it was in front of the house number given him, and also because the inspector had marked it with a round red mark. Witness examined the cover and ring, and identified it as the one he had taken up. Witness further testified that he stamped on it to see if it was

in good condition, and walked over it and stood on it, and that it did not come out of the ring until he lifted it out with a pick; that it was perfectly level with the sidewalk, and that he tried the cover with a string line to ascertain if it was even with the grade of the street, and that at the point where the top was the sidewalk was perfectly level, and did not seem to have any slope or grade in it.

Another witness who was with the former witness corroborated this testimony.

Another witness testified he was an assistant foreman in the sewer department, and that his duties as such are to flush and examine the sewers; that he makes the examination at the time the sewers are flushed, and that the sewer top and ring in question were located in the territory covered by him; that he had seen many covers like the one in evidence, and that there are three or four of them located on Water street, one on the south side of Corcoran street, west of Fourteenth street, Northwest, and some on Third street, Southeast, between Virginia avenue and South Carolina avenue, and that he was unable to locate others without reference to a record; he could locate others in some other sections of the city; that he and his laborer, Simmons, flushed this particular sewer on December 26, 1911, June 4, 1912, and September 21, 1912; he detailed the manner of flushing by stating that after laying the hose from the fire hydrant the cover of the sewer is taken off, and the rabbet of the frame on which it rests is cleaned out with a pick, the sewer then flushed, and if any grit or anything gets in the frame while cleaning they clean it again before the cover is replaced, to see that the cover rests perfectly on the frame before leaving; further stating that if he discovered anything wrong he made a report of it to the sewer department, but that he had never had to report any of the sewers on the north side of K street for any defects whatever; that he kept a record of his inspections, flushings, and defects discovered, if any.

On cross-examination stated that he covered the territory assigned to him about once in four months; that his territory extended from Seventh street to Tenleytown and included

hundreds of manholes; that inspections were made as often as possible, and that it took about four months to cover this territory; that he particularly remembered this particular sewer for the reason that he paid more attention to light-weight covers in any section of the city than he did to the heavier ones, and that this was a lighter cover than some, but no lighter than used in some other sections of the city.

This testimony was corroborated by his assistant, Simmons.

Henry Schneider, a captain of police, testified for the defendant that he is a captain of the police precinct in which is located K street, between Thirty-second and Thirty-third streets, Northwest; that he is familiar with the block in question and has been so for over fourteen years; that in the past three years he had visited this section on an average of five times a week.

Witness then identified certain photographs introduced as photographs of the locality in question, and stated that, in making his visits to the locality, he would go past or over the manhole in question, and that he never saw anything the matter with the sidewalk or the sewer manhole; he stated that there was kept at his station a record book of all accidents, and that he had looked at his record book, beginning with June of 1912, and down to September of 1912, and that he did not find any record of any accident at this point during that period. On further examination witness stated that it was one of his duties to report any dangerous conditions existing in the sidewalk or street, and that this duty also rests upon all police officers, but that no officer had ever reported to him any defect in the manhole in question; that he had seen boys remove sewer tops in various parts of his precinct, particularly at street corners, and go down in the manhole to recover balls which had rolled into the sewer.

On cross-examination witness testified that his duties of inspection as to these sewer tops were confined to surface conditions only; but that if he found one out of place he would put it back and report it, it being no part of his duty to inspect them otherwise; that he is familiar with the tops in George-

town, that they weigh 35, 40, or 50 pounds, and some of them have to be turned to unlock before they can be removed.

Others testified that they knew the manhole cover but nothing particular about it; just passed over it, taking no particular notice of it as there was nothing to attract their attention.

The court gave instructions for the plaintiff to the effect that the District of Columbia is charged with the duty of using reasonable care and diligence to keep the sidewalks of the city in condition fit for convenient use.

That in determining whether the defendant had discharged its duty of using reasonable care to keep and maintain the sidewalk in question safe against accident to a person properly using it, they should consider that it was not only necessary that the covering of the manhole when in place should be sufficient to sustain the weight of persons passing over it, but also necessary that such covering should be sufficient to secure the holding of it in its proper place against the ordinary use of the sidewalk.

That if they should be satisfied from the evidence that the manhole became and was in an unsafe condition, and that such condition continued so long prior to the accident in question as that the defendant, the District of Columbia, in the exercise of reasonable care, ought to have known of said condition, then the District of Columbia is chargeable with notice of such condition from the time when, in the exercise of such reasonable care, it ought to have been discovered.

That it was the duty of the defendant to inspect the manholes in question with ordinary care, and within reasonable periods, to see whether defects existed therein.

Defendant asked a number of instructions.

First, that the jury return a verdict for the defendant; it was refused.

Second, that the defendant has fulfilled its whole legal duty to the public and the plaintiff if the manhole cover was so constructed and so fitted in its holder as to afford safe passage over the cover to pedestrians.

A third, that the District of Columbia is under no legal duty

to the public to so construct and maintain sewer manholes and their covers as to render impossible the removal of those covers by persons deliberately attempting to do so.

A fourth instruction to the jury, that a slight rocking motion or a slight flaw in the cover do not, as a matter of law, render the defendant liable in damages to the plaintiff on the theory that such movements, if the jury find such movements to have existed, are conclusive evidence of a defect in construction; but the jury are to consider these movements of the cover in connection with all of the other evidence, and from all that evidence must find, before returning a verdict for the plaintiff, that the cover in question was so defective as to be obvious to anyone exercising reasonable care under the circumstances. This instruction was refused.

Further instruction, that the defendant is not an insurer or guarantor of the safety of its sidewalks, but is only bound under the law to construct and maintain its sidewalks in a reasonably safe condition for travel thereon under the ordinary conditions of travel, and if the jury found that this sidewalk on the north side of K street, Northwest, was so constructed and maintained, then the jury should return a verdict for the defendant. This was given.

Another instruction that in order to return a verdict for the plaintiff they must find that the manhole cover complained of was in a dangerous and unsafe condition and so continued for so long a time that the defendant should have discovered that condition in the exercise of reasonable care under the circumstances in time to have remedied such defect. This was given.

Another instruction to the effect that evidence tending to show that the manhole cover could be forcibly kicked from its normal position by a person deliberately attempting to do so does not, of itself, constitute any proof or evidence of defective construction or maintenance of the manhole or its cover. This was refused.

If the jury believed from the evidence that the accident to the plaintiff was caused by the faulty design or plan of the

sewer trap or manhole, the verdict should be for the defendant. This was refused.

Further instruction was refused to the effect that there is no sufficient notice in this case to charge the defendant with constructive notice of the defect.

The general charge to the jury was on the same lines, and no special exception was taken to it.

Defendant assigned for error (1) the refusal of the court to grant its first, fourth, seventh, eighth, and ninth prayers; (2) the court erred in admitting in evidence, over objection of defendant, testimony offered on behalf of the plaintiff tending to show that manhole covers now in use are different in construction as to weight and rims for protection; (3) the court erred in admitting in evidence, over the objection of the defendant, testimony tending to show that the manhole could be displaced with slight effort by lifting or pulling the same, or by lifting and pulling the cover.

*Mr. Conrad H. Syme,* Corporation Counsel, and *Mr. Robert L. Williams,* Assistant, for the appellant.

*Mr. A. E. L. Leckie, Mr. Joseph W. Cox, Mr. John A. Kratz,* and *Mr. Joseph T. Sherier* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The first assignment of error relates to certain special instructions refused by the court.

1. The court did not err in refusing to direct a verdict for the defendant.

There was some evidence tending to show that the cover of the manhole was warped and did not fit, and was easily displaced when trod upon. Also that this condition had been in existence for a considerable period of time, from which the jury might have found that it would have become known to the District of Columbia by reasonably careful inspection.

2. The fourth and ninth instructions were rightly refused. The charge of the court covered such principles of law as were contained therein.

3. The eighth prayer, reading, "If the jury believe from the evidence that the accident to the plaintiff was caused by the faulty design or plan of the sewer trap or manhole, the verdict should be for the defendant." This instruction was applicable to the evidence of the expert, Weller, whose evidence tended to show that the cover was faulty in plan or design because it was not as heavy as now required and had no rim to make it more difficult to remove.

The instruction should have been given. *Johnston* v. *District of Columbia*, 118 U. S. 19–21, 30 L. ed. 75–77, 6 Sup. Ct. Rep. 923.

4. The second assignment of error is founded on an exception to the testimony to the effect that there was a different and heavier sewer cover in use generally in the District of Columbia, since the earlier construction of the kind involved in this case.

The question for the jury to determine was whether the cover in question was in safe condition. It was not for them to compare it with a later type adopted by the District, and find that it might have been safe if substituted by the later construction of the better type. The responsibility cannot be made to depend on the varying opinions of juries as to what kind of structure the District of Columbia should have used in its construction.

It was not bound to insure the absolute safety of the appliances, nor is it bound to supply the best and safest, or newest, of those appliances for the purpose of securing the safety of persons coming in contact therewith.

Their obligation was to use all reasonable care and prudence for the safety of persons traveling the sidewalk, by providing them with appliances reasonably safe and suitable for their use. *Washington Asphalt Block & Tile Co.* v. *Mackey,* 15 App. D. C. 410–425; *Washington & G. R. Co.* v. *McDade,* 135 U. S. 554–570, 34 L. ed. 235–241, 10 Sup. Ct. Rep. 1044;

*Southern P. Co.* v. *Seley,* 152 U. S. 145–153, 38 L. ed. 391–395, 14 Sup. Ct. Rep. 530.

It was error to admit this testimony.

5. The third assignment of error is founded on an exception to testimony, offered on behalf of the plaintiff, tending to show that the manhole cover in question could be displaced with slight effort by lifting or pulling the same, or by both lifting and pulling the cover.

This exception is not well taken.

The evidence tended to shed light upon the question whether the manhole could be displaced by stepping upon it, and the jury would not likely be misled.

For the errors pointed out above, the judgment is reversed, with costs, and the cause remanded for further proceedings.

*Reversed and remanded.*

Mr. Justice Robb dissenting.